IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 3, 2018

## IN RE: JAYLA H.

**Appeal from the Juvenile Court for Bradley County
No. J-12-343     Robert D. Philyaw, Judge**

_____

### No. E2018-00735-COA-R3-PT

_____

Tabatha H. ("Mother") and James M. ("Father") appeal the April 5, 2018 order of the Juvenile Court for Bradley County ("the Juvenile Court") terminating their parental rights to the minor child, Jayla H. ("the Child"). We find and hold that the Juvenile Court did not err in finding that there was clear and convincing evidence of grounds to terminate Mother's parental rights for abandonment by willful failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1), and that there was clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated. We further find and hold that the Juvenile Court did not err in finding the evidence to be clear and convincing as to grounds to terminate Father's parental rights for failure to establish paternity pursuant to Tenn. Code Ann. § 36-1-113(g)(9), and clear and convincing that it was in the Child's best interest for Father's parental rights to be terminated. We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which W. NEAL MCBRAYER and ARNOLD B. GOLDIN, JJ., joined.

Bradley N. Wilson, Cleveland, Tennessee, for the appellant, Tabatha H.

Abigail Burke Carroll, Athens, Tennessee, for the appellant, James M.

L. Ashley Gaither, Cleveland, Tennessee, for the appellees, Phillip H. and Peggy H.

# OPINION

## Background

The Child was born in November of 2014. In January of 2016, Peggy H. ("Grandmother") and Phillip H. ("Grandfather"), the Child's maternal grandparents, were granted custody of the Child by the Juvenile Court. Grandmother and Grandfather previously had adopted the Child's half-sister ("the Child's Sister"), another child of Mother's. Grandmother and Grandfather filed a petition in February of 2017 seeking to terminate Mother's and Father's parental rights to the Child.[1] The case proceeded to trial over multiple days in January and February of 2018.

At trial, Grandmother testified that she and Grandfather have been married for almost 28 years and that they are Mother's parents. The Child was born in November of 2014. Grandmother and Grandfather obtained physical custody of the Child in August of 2015, and the Child has remained in their custody continuously since that time. The Juvenile Court entered an order granting Grandmother and Grandfather temporary custody of the Child in January of 2016. Mother and Father both were in court when the Juvenile Court granted Grandmother and Grandfather temporary custody. The Child was ten months old when she began residing with Grandmother and Grandfather and was three years old at the time of trial. At some point in time after Grandmother and Grandfather petitioned for custody of the Child, the Department of Children's Services was contacted, and Mother and Father both were drug tested and failed. Grandmother testified that she believed they failed the drug test for marijuana.

Grandmother explained that she and her husband first had physical custody of the Child beginning in August of 2015 when the Child came to their house and never left. Grandmother explained:

> [Mother] never once told me that she was coming back to get her. She called when she had phone service to see what was going on. As most people know, single mothers usually get on the WIC program, the government assistance. She had let that lapse so I was having to purchase formula, which is very expensive.
>
> In November of 2015 I took [the Child] . . . to the doctor for her first shots and her one year checkup and found out she had no health insurance. None. It had lapsed and cancelled. And to me it just proved that if she

---

[1] Grandmother and Grandfather filed two separate, but substantially similar, petitions to terminate. The February 2017 petition was the second of those petitions filed and was the petition that was tried.

wasn't going to keep up those simple things for her child then she wasn't taking care of her like she should.

Grandmother did not know what Mother was doing at that time or where Mother was staying. Mother did not have a permanent residence or a job at that time.

Grandmother and Grandfather set up a visitation schedule with Mother when they were granted temporary custody of the Child. Mother was to visit every Sunday from 2 p.m. to 5 p.m. Grandmother stated: "Eventually I had to change it to - - I gave her - - she got to where she was coming later and later and later. There were times I was having to wait until like 3:00 and 3:30 in the afternoon for her to show up." Grandmother finally told Mother that they would need to cancel the visitation for that day if she could not arrive by a certain time. Grandmother stated: "I did that because I wanted to make her do what was right. And that's the only way I knew how to do it was to set a boundary." Grandmother further testified that the visitations:

> took off on a rocky start because the first three visits [Mother] never showed up for. After that, after I set a boundary for her she did show up. The problem with that was it was 90 percent of the time I had to figure out a way to get her back to wherever she was going. And there were a couple of times I know for a fact she walked but I ended up having to take her back.

Grandmother never told Mother that if she did not have transportation she could not visit. Grandmother stated: "I did not want to ever - - for anybody to ever say that I denied her her child. . . . But I always made sure that I was never going to be accused of denying her her child." The visits started in January of 2016. Grandmother testified:

> I always thought [Mother] would do something. She would get her child back. . . . Probably about five months into I realized that she had no desire. It's not that I don't think she loves her because I think she does but she doesn't love her the way a mother should. And I just - - I was like, I'm not going to sit around and wait forever for her to grow up and take on responsibility. I'm not doing it.

Grandmother testified that she was seeing the same behaviors in Mother that led to Grandmother and Grandfather adopting the Child's Sister.

At the time of trial, Grandmother resided in Cleveland, Tennessee. Grandfather, the Child, and the Child's Sister resided in Irvington, Alabama, where they had resided since July of 2016. Grandfather is the primary caregiver for the Child and the Child's

Sister, and is a stay-at-home dad. Grandmother works outside the home. After Grandfather and the girls moved to Alabama, Grandmother moved in with her oldest daughter. Grandmother testified that she planned to move to Alabama when this case is resolved. At the time of trial, Grandmother was residing with her older two children, and they have allowed Mother to stay at their home too.

Grandmother explained that Grandfather initially went to Alabama to take care of his mother after the death of Grandfather's father. Grandfather's mother was 78 years old at the time of trial. Grandmother explained that Grandfather's mother "was struggling with paying bills and keeping up the house." Grandmother explained that Grandfather's mother "signed the house over to [Grandfather]. In return he moved down to upkeep and help her with bills so she could finish out what little bit of life she's got left with no worries." Both the Child and the Child's Sister went with Grandfather when he moved to Alabama. Grandmother testified that she and Grandfather told Mother about the move to Alabama approximately one month before it happened.

Grandmother admitted that prior to Grandfather and the girls moving to Alabama, Mother would visit with the Child during her scheduled visitation time more often than not. Mother does not have a car. Grandmother sometimes picked Mother up so Mother could exercise visitation. Since moving to Alabama, the Child and the Child's Sister have been back to Tennessee for a visit on one occasion, during the summer of the year prior to trial. Grandmother goes to Alabama once a month to visit with them, and she testified that she would tell Mother several days in advance when she was going. Grandmother sometimes took Mother to Alabama to visit. Grandmother testified that when she took Mother to Alabama, Mother did not have to pay Grandmother anything to go and that Grandmother provided the gas and the food.

Grandmother testified that during the relevant statutory four month period prior to the filing of the petition, which was October 17, 2017 through February 16, 2018, Mother visited the Child once. Grandmother stated:

> I think it was just a random visit I made. I went [to Alabama] and she just happened to be there. You know, she happened to be there and wanted to go and I said, okay, you can go. That's fine. But it seems like every time I had a chance to go she was not around.

During the relevant four month period, Mother never came to Grandmother and told her that she wanted to go with her to visit the Child. Mother did send some text messages, but they were sent after Grandmother had left for Alabama. Grandmother stated: "Well, you've got to be there when I leave if you want to go. I'm not going to chase you around." Grandmother stated: "She knew when I was going to go." Grandmother

4

testified that she told Mother ahead of time when the trips were going to occur and that she also sent Mother text messages telling Mother "[t]hat she needed to be, you know, at the residence so we could all leave together because it was a family going. We were all going at one time." Grandmother stated that Mother "knew that we were leaving on this day at this time. And then she text [sic] us four hours after we leave, can somebody come get me." Mother has visited the Child in Alabama five times in two years.

Grandmother and Grandfather have financially supported the Child. Grandmother testified that they are financially able to care for the Child. Grandmother and Grandfather did file for bankruptcy, but Grandmother stated that the bankruptcy will have been completed two years ago come June of 2016. She stated that even though she and Grandfather filed for bankruptcy, they always have been able to provide food, clothing, and shelter for the Child.

Grandmother works for Flowers Bakery in Cleveland, Tennessee. She works third shift and works some overtime also. Grandmother works approximately 36 hours per week at Flowers Bakery. She also works part-time for Speedway, three or four days a week for approximately seven hours per day. Grandmother is looking for jobs in Alabama.

Mother never has paid any child support for the Child. Mother has worked during part of the time that Grandmother and Grandfather have had custody of the Child. Mother worked for Amazon for a month and a half and never offered Grandmother any money. Mother never provided diapers, wipes, or formula for the Child. Mother has had no medical problems, disability, or incarceration that would have prevented her from working. Since Grandmother and Grandfather have had custody of the Child, Mother has been in jail. Grandmother could not remember what the charges were or how long Mother was in jail. Mother did buy the Child a present this past Christmas, but prior to that gave the Child no Christmas or birthday presents or cards.

Grandmother testified that the Child is on a waiting list to attend a Head Start program. She is up-to-date on her medical and dental checkups, and she now has insurance. Grandmother was asked what the Child likes to do, and she stated:

> [The Child] goes to a dance studio. She does tap. She does jazz. She goes fishing. She loves going to the beach. She loves anything outdoors. They go to church where she's in children's choir. She is just - - she's an outdoor kid. She wants to be where the outdoors is. It doesn't matter what's going on, she wants to be outside. That's where she wants to be.

Grandmother has no relationship whatsoever with Father. Father was not at the hospital when the Child was born. Grandmother stated:

> [Father] was not at the birth of [the Child] because he was banned from the property. For whatever reason, I don't know. That's just what I know. She was born - - and I know he came to the hospital the day after she was born and he was escorted off the property by then SkyRidge security.

Grandmother stated that Father was not allowed to see the Child at the hospital.

Grandmother testified that during the time she and her husband had physical custody of the Child before they were granted temporary custody, Father never saw the Child. Father never reached out to Grandmother and Grandfather and asked to see the Child. Grandmother testified that during the relevant statutory four month period prior to the filing of the petition, Father saw the Child once.

As to the one occasion when Father saw the Child, Grandmother explained:

> I'm not sure exactly when the date was but [Mother] had come for her visit and she asked if she could take [the Child] outside to see him. And I said for a moment because it's cold. He wouldn't come to the door. He wouldn't step inside the house. And I let her take her outside for a few moments and then I asked her to bring her back inside so she didn't get sick.

Grandmother testified that this happened in February or March. Grandmother testified that she never told Father that he could not come inside.

Grandmother testified that if Father had shown up with Mother during one of her scheduled visitations, Grandmother would have allowed him to visit the Child. Grandmother admitted that she does not care for Father, but she stated that she "would never deny him the child." Father has known where the Child was living and has maintained contact with Mother during the time that Grandmother and Grandfather have had custody of the Child.

Father has never paid any support for the Child. Father never provided diapers, wipes, or formula for the Child. Grandmother does not know of any job that Father ever has had. Grandmother is not aware of Father having any type of disability. Grandmother has never known Father to have his own place to live. Father never has filed anything to establish paternity of the Child.

6

Grandmother wants to adopt the Child if the Child becomes available for adoption, but when asked if it was her intention to cut off all contact with Mother, Grandmother stated:

> The reason I am doing this is because unfortunately I feel - - it's not that I feel. It's I know. They cannot even take care of themselves, there's no way they can take care of a child. They struggle day to day to care for themselves and they're grown adults.

> [Mother] is my daughter. She will always be in my life. I will never turn my back on her ever but as far as taking care of a child she can't do it. She will know who [the Child] is. [The Child] knows who she is. And I've kept that with [the Child's Sister] as well. I never have denied her in any way. That is her decision whether she wants to be in their life but I am - - I want those girls to be taken care of and I don't think either one of those can do it.

Although she will never turn her back on Mother, Grandmother testified that she would protect the Child from Mother if necessary.

Grandfather also testified at trial. He was asked about the Child's activities, and he testified that the Child takes dance lessons and that every Saturday they go skating. On Sundays the Child and the Child's Sister go to church in the morning and to choir at church in the evening. Grandfather testified that when the weather is nice, they spend time at the beach. Grandfather testified that the Child loves to go fishing. Grandfather takes the Child fishing often.

The Child calls Grandfather 'dad' and Grandmother 'mom.' Grandfather stated: "That was never intentional. We didn't try to get that." He explained that the Child imitates her older sister who calls them by those names. The Child also calls Mother 'mom' because her older sister calls Mother 'mom.' Grandfather testified that the Child knows that Mother is family.

Grandfather testified that Mother, in the past, had lived in the house in Alabama where he and the girls currently reside, and she knows where they are living. During the relevant four month period prior to the filing of the petition, Mother only came to Alabama once to visit the Child.

Father never has tried to contact Grandfather. Grandfather testified that he posts his phone number on his Facebook page, which is not private, so anyone can reach him. Grandfather testified that the Child has no idea who Father is.

Neither Mother nor Father ever have given Grandfather and Grandmother support money for the Child. Grandfather was asked if he ever called Child Support Services to have child support established, and he stated: "Sir, I was never going to do that for the simple fact that she has a hard enough time taking care of herself and I figured that eventually she may get herself straightened out and this day would never come." Grandfather explained that he and Grandmother applied for custody of the Child because the Child needed her shots, and they needed custody to be able to apply for insurance for the Child.

Grandfather testified about one of the Child's birthday parties. He stated:

I was a little upset on [the Child's] birthday. Everyone wanted to go to the birthday party but they didn't want to come to the house so we did this big thing at McDonald's so that anybody who wanted to show up, please do.

The only person who showed up was [Mother] and she stayed for just a few minutes and she's outside of McDonald's on her phone the whole time. The whole party. Not one person other than my immediate family showed up to McDonald's. We could've had this nice party at my house with this little bonfire and cooked hot dogs but had a great time but no one showed up.

Grandfather wants to adopt the Child if she becomes available for adoption. When asked why, he stated:

I'm asking mostly - - she needs something stable. At this point in time both [Mother] and - - what's his name? . . . I can't remember his name. [Father]? . . . Is a mystery to [the Child]. She has no idea who he is. She does know [Mother] by site [sic]. But she needs a foundation. She needs a place to grow up safe, happy where she can develop her skills and I can't think of anyone I'd rather go fishing with.

Mother was 26 years old at the time of trial. She testified that her parents adopted the Child's Sister in 2014. Mother explained that Grandmother and Grandfather were granted temporary custody of the Child's Sister in August of 2012, on the Child's Sister's third birthday.

8

Mother testified that when the Child lived in Tennessee, Mother visited every Sunday except for two times. Mother has not visited as frequently since the Child moved to Alabama because Mother stated she doesn't "have a way down there." Mother does not have a car, does not have access to a car, and does not have the money for air fare or bus transportation. Mother testified that Grandmother took her to Alabama twice. Mother, however, claimed she did not always know when Grandmother was going to Alabama. Mother testified that she did ask for rides, but that Grandmother would tell her she wasn't going to Alabama or that she had to work that weekend.

Mother stated that she has visited the Child in Alabama "[a]bout four times." She testified:

> I don't remember exactly the dates but there was a couple of days before Halloween in 2016 and then for Christmas of 2016 I wasn't able to go because I wasn't where I'm staying at my brother and sister's. And Christmas in 2017 I went. And then I think it was in 2015 or 2016 my granddad died so I went down there for his funeral and I actually spent some time with [the Child].

Mother has not talked to her parents about coordinating visits so that she might visit more frequently. Mother never contacted her father to ask for visitation. Mother admitted that Grandmother never told Mother she couldn't visit the Child. Mother stated: "It's - - she told me - - like we planned a weekend to go and then she told me that she ended up having to work that weekend. But I did wake up on Friday mornings about twice with her not being there and I was never told about that." Mother admitted that she did nothing to prevent her father from moving to Alabama with the Child. Mother admitted that she used to live where the Child currently lives.

Mother was asked what she did since the filing of the petition to get visitation with the Child, and she stated: "I honestly did not know I could fight it." Mother admitted that she knew where the courthouse was, and that she knew CASA and Foundation House Ministries had been appointed to the case. Mother claimed that she contacted CASA in early 2017 asking about court dates, but stated that CASA would not tell her anything except that there were no upcoming court dates.

Mother testified that she did not visit the Child at all during the relevant four month period prior to the filing of the petition. She then was told that Grandmother had testified that Mother had visited three times during that period[2], and Mother stated:

---

[2] Grandmother actually testified that Mother had visited the Child once during the relevant four month period, as discussed earlier in this Opinion. Grandmother's testimony was misconstrued during the examination of Mother causing some confusion within the record.

9

"Okay. Then, yes, I did visit like three times." Mother could not tell what dates those visits occurred.

Mother currently lives with her brother and sister. Grandmother also lives there. Mother testified that Grandmother talks to the Child on the telephone every day. Mother was asked if she ever talks to the Child on the telephone, and she stated: "I have got to talk to her one time. That was many months ago and it was on a video conference." Mother was asked if she had the means to call the Child, and she stated: "I mean, I would call but my phone is messed up, as you say. Because my phone has been not working properly."

Mother admitted that she has not called the Child while the Child has been in Alabama. Mother was asked if she had a phone during that entire time, and she stated: "Yes, but I do not have any minutes on it. I don't have any calling minutes." She was asked if during the entire time the Child has lived in Alabama she had no calling minutes, and Mother stated:

> Yes, but - - I mean, I don't feel comfortable talking to my - - because I have to talk to my dad first before I can talk to her because he always answers. I just don't feel comfortable talking to my dad over the phone. . . . Because me and my dad don't really talk.

Mother was asked if she was unwilling to spend 30 seconds talking to her father to ask to speak to the Child, and she stated: "I would but, I mean, I don't really know what he would say or if he would just hand her the phone. I really don't know what he would do." Mother admitted that she never tried calling the Child. Mother never sent the Child cards, letters, or pictures.

Mother has no physical disabilities. From January of 2016 to February of 2017, Mother held one job, which was at Amazon and lasted from June to August. Mother was asked what prevented her from using her income from Amazon to get a bus ticket or pay someone for gas so she could go visit the Child, and she stated: "I don't know." Mother claims that she applied for two other jobs and was denied. When questioned further, Mother admitted that she has not applied for any jobs since August of 2016.

Mother does not have a driver's license or state identification. She claimed her license was revoked over a year ago for violation of probation. Mother was asked what she has done to get her license reinstated, and she stated:

I have to pay the $140 to get it unrevoked and then I - - or I can get a state I.D. but I have to have my birth certificate and the two forms of - - I mean, the two pieces of mail that has the address on them.

Mother admitted that she had two means to obtain identification so that she could work and that in a year's time she had exercised neither of those means. Mother claimed that her sister was going to help her obtain identification and has not done so. When pressed, Mother admitted that it is her own fault that she does not have identification to allow her to obtain a job so that she could visit the Child in Alabama.

Mother admitted that she went to jail after the last court hearing for violation of probation. The underlying charge was criminal trespassing. Mother was asked if that was resolved, and she stated: "I am actually supposed to go to probation the ninth and I'm going to - - because I can do community service to drop some of it down, I'm going to see about starting community service."

Mother was asked why termination of her parental rights was not in the Child's best interest, and she stated: "Because I'm her mom. She knows I'm her mom and I love her and I can't let her go." Mother claimed that she and the Child have a close relationship. She stated: "We play. We talk. We do everything."

Father testified at trial and claimed that he "took care of [the Child] after she was born." Father was asked if he tried to attend the Child's birth, and he stated:

The night she was born I was at work and I was - - I went there - - you know, I couldn't leave work. I had no ride, you know. Shaw two, it's in Charleston so I'd have to walk all the way back so I just stayed at work. Next day I went to the hospital.

And my issue, being me escorted off the property unless I was, you know, in the E.R. Other than that - - I mean, I went in there. Knowing good and well I wasn't supposed to be on the property I went in there.

I originally was going to try to find out how - - you know, because I wasn't able to be there to sign the birth certificate so I originally - - I tried to figure that out. But it didn't happen like that. I was holding my daughter. Security came in there.

Father was asked where the Child lived when she was released from the hospital, and he stated: "At the time [Mother] was living with [her mother and father] and I, you

know, was still having difficulties because I've never had really a stable place to call my own." Father was asked when he next got to see the Child, and he stated:

> Me and [Mother] was having some relationship issues. So at that point in time she would actually bring her to see me but me and her wasn't really on steady talking terms at that moment. But I would say like maybe a week after she was born I finally got to, you know, hold her and - - other than when I went to the hospital, obviously.

Father was asked how frequently he saw the Child during the first year of her life, and he stated:

> All the way up till maybe about I think - - let's see here. I worked at McDonald's there for awhile so I would say ever since then - - ever since she was born all the way up till about maybe four months before, you know, the end of the year she pretty much was being taken care of by me and my family.

Father admitted when questioned further that Mother was a caregiver for the Child during that same time period.

> Father was asked when his visits with the Child ceased, and he stated:

> About that time me and [Mother] had got into it because I told her I wanted her to go get my child. We got into an argument at McDonald's parking lot so that caused me to lose my job. And pretty much it was because I wanted her to go get my child because I would like to, you know, see my child. So I would say pretty much about right after - - you know, they started right after they got her. Or her mother and father. Excuse me.

Father explained that he wanted Mother to go get the Child who was with Grandmother and Grandfather. Father was asked if he was okay with the Child being with Grandmother and Grandfather, and he stated: "Yes. I mean, here and there, yeah, but constantly, no, I was not okay with it to be honest." Father was asked how well he knew Grandmother and Grandfather, and he stated: "All I really know is their names. Other than that, ever since they met me they haven't really liked me so . . . ." Father stated he did not feel welcome to go to their home.

Father was asked if at any point he had the financial ability to file a petition seeking visitation with the Child, and he stated: "no, I have not. If I did I would've already done it way beforehand." Father testified that he was in court when Grandmother

12

and Grandfather were granted temporary custody of the Child, but that legally he had no right to participate in the proceedings. Father testified that he never was offered social services or a DNA test. Father admitted that when he was in court the day Grandmother and Grandfather were granted temporary custody of the Child, he got "angry and a little upset so [he] got a bit smart at that point and moment." Father was asked if he reached out to anyone else for assistance in establishing paternity, and he stated:

> Yeah. I mean, I've tried - - you know, I've tried to do all that to figure out how to get it done. But I also had some legal issues so - - you know, because I was on probation. So I violated probation. I went to jail. Back in September I got arrested for a violation of probation, served four months in Bradley County work release. And I got released and I'm not on probation no more.

Father claimed he went to the clerk's office on the day Grandmother and Grandfather were granted temporary custody of the Child and was told it would cost "a hundred and some odd dollars" to file. Father stated: "I'm still trying to come up with a means to get the money." That visit to the clerk's office was in January of 2016. Father claimed no one ever told him that day that he could file for indigency status.

During the three and a half years the Child has been alive, Father worked at Amazon for less than a month, at Staff Management for M&M Mars for a couple of months, at Wendy's for a week, at Brown Stove on work release, at Duracell on work release, and at McDonald's for about six months. Father was asked why he was not able to come up with the $114 to file a petition after working all of those jobs during the past three years, and he stated:

> But I was also aware that I didn't have nowhere to go so therefore I have to worry about what I'm going to do. If I'm paying for a hotel room I'm not going to have the means to, you know, pay for that even though that should've been my first priority.

During work release, Father was paid $28 a day and had to pay back approximately half of that money. Father stated that a full paycheck for work release was between $330 and $350. Father was asked where the remaining money went when he was released from jail, and he stated: "I had to eat. You know, when I got out of jail I only had a few dollars."

When asked where he currently lives, Father stated: "Nowhere." He claimed he had been staying with a friend, but the friend asked him to leave.

13

Father never called the Child and never sent her cards or presents. He claimed that while he was incarcerated Mother purchased a present for the Child that was from both of them. When asked if he paid for that present, Father stated: "Not physically, no, but it's the thought that counts to me."

Father was asked if he had any relationship whatsoever with the Child, and he stated: "No, I haven't had a chance to have a relationship with my daughter. . . . Because of the situation. This situation and, well, me not having nowhere to go." He was asked to clarify what situation he was talking about, and he stated: "This right here. You know, we're in court. Custody hearing for them to adopt - - take my rights away, in which - - . . . ." Father claimed Grandfather told him when the Child was living in Tennessee not to come to Grandfather's property because he was not welcome.

Father was asked who had prevented him from seeking to legitimate the Child, and he stated: "Nobody. I mean, other than myself. Not, you know, having transportation and stuff like that."

After trial, the Juvenile Court entered its order on April 5, 2018 terminating Mother's and Father's parental rights to the Child after finding and holding, *inter alia*:

> 3. The subject child, [the Child], was born to [Mother] on November . . ., 2014 in Bradley County.
> 4. Physical custody of the child was placed with the Petitioners in August 2015 and [the Child] has remained in the Petitioner's physical custody since that date.
> 5. Petitioner[s] were granted temporary legal custody by order entered January 5, 2016 and by amended order entered January 26, 2017.
> 6. There are no other persons entitled to notice pursuant to T.C.A. § 36-1-117 of this proceeding or of any subsequent adoption proceeding regarding the subject child.
> 7. [Grandmother] is currently living in Cleveland, TN while [Grandfather] and the subject child have been living in Irvington, AL since July 2016.
> 8. [Mother] let her WIC lapse or expire as well as her health insurance which led to the Petitioners obtaining custody of the subject child.
> 9. [Mother] and [Father], putative father, were at the hearing when temporary custody was granted to the Petitioners.
> 10. Visitation with the mother was set up for Sundays from 2:00 p.m. to 5:00 p.m. but was not court ordered.
> 11. [Grandmother] testified that she and [Grandfather] tried to accommodate mother with the visits.

14

12. Mother testified that she visited three times during the period of October 17, 2016 through February 17, 2017. Petitioner, [Grandmother], testified mother visited once.

13. Petitioner, [Grandmother], testified that mother knew four weeks before the move to Alabama. Mother testified she knew about it but it was only about a week before.

14. There is no indication that Mother voiced an objection or filed anything or did anything in regard to the knowledge of the move.

15. Petitioner, [Grandmother], testified that mother knows where the Alabama house is and lived there as a child. Petitioner, [Grandmother], further testified that Mother knows the family home[.]

16. Petitioner, [Grandmother], testified that Mother could go to Alabama with her when she went and, in fact, did go with her several times.

17. Petitioner, [Grandmother], testified that the putative father just simply didn't visit.

18. Petitioner, [Grandmother], testified that the putative father visited once during the four months preceding the filing of the February 2017 petition.

19. Putative father, [Father], testified that he was very involved in the child's first four months.

20. The putative father is homeless. Mother would be except she's living with family.

21. Both of these parents have struggled with maintaining employment. Both of these parents have only worked minimally in the time that this child has been born. Mother indicated the main reason she's not employed is because her driver's license is expired or revoked and has been for over a year.

22. Putative father's longest stint of employment appears to be when he was actually in jail and was on work release.

23. Putative father never filed anything to say "I'm the biological father."

24. The evidence shows that the time the father was in jail and was on work release, he was making $330 a week and could have paid the filing fee if indeed the filing fee was the barrier.

25. There is no indication either of these parents have or had any disabilities that would prevent them from working, supporting their child, or doing the other things that parents need to do to regain custody or to establish paternity.

26. Both Petitioners testified that they are financially able to care for the subject child.

27. Petitioner, [Grandfather], testified about the daily activities and all the things that they do, everything from dancing to fishing and everything in between.

28. Petitioner, [Grandfather], testified that he remembered putative father coming once before the move to visit and that the mother could visit any time she wanted. [Grandfather] further testified everybody has access to his contact information because he has it posted on Facebook.

29. There appears to be nothing that prevented these parents from visiting with this child by phone regularly, if not daily, and yet there's no indication that they tried.

30. Petitioner, [Grandfather], testified about what a delight this child is and how committed he and [Grandmother] are to her needs and to her sister's. [Grandfather] further testified it's his belief the child doesn't know the father.

31. Petitioner, [Grandfather], testified that they had hoped and thought that mother would do what she needed to do to regain custody and testified that in their mind that just never happened.

32. Petitioner, [Grandfather], testified about how important permanency was, a permanent home. [Grandfather] further testified that starting school and knowing that the child can remain in the same school was very important.

33. Mother and putative father, when asked about the child's best interest, their testimony fell really short.

34. Mother didn't deny that she knows she could call and talk to this child when she wants to.

35. Mother testified that she knows that this child has a great relationship with her older sister, [the Child's Sister], and that they're bonded.

36. The proof is clear that neither of these parents have ever had their own residence and neither have been able to sustain themselves much less a child.

37. Father acknowledged through his testimony that he has no relationship whatsoever with the child other than knowing he's her biological father.

Based upon these findings of fact, the Court finds that the following grounds exist for the termination of the Respondents' parental rights:

* * *

2. The Court finds by clear and convincing evidence that the parental rights of the Mother shall be terminated based on the ground of Abandonment - willful : Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i) abandonment by parents by willfully failing to visit the child in the 4 months immediately preceding the filing of the Petition.

16

3. The Court finds by clear and convincing evidence that the Mother willfully failed to visit or just made token visitations. [Grandmother] testified that Mother visited only one (1) time during the four (4) months preceding the filing of the termination petition. Mother testified she visited three (3) times during the four (4) months preceding the filing of the termination petition. Mother knew the location of the placement of the child and did not visit.

\* \* \*

5. The Court finds by clear and convincing evidence that the parental rights of the putative father shall be terminated based on the ground of Failure to Establish Paternity of the Child: Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) by failing to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3).

6. The Court finds by clear and convincing evidence that the putative father, [Father], failed to file a petition to establish paternity of the child. The Court finds that the putative Father knew he needed to establish paternity. The putative Father, early in the case, even went so far to go [sic] the clerk's office to file a petition but did not have the required money for the filing fee at that particular time. The putative Father never went back to the clerk's office to file the petition. The Court finds by clear and convincing evidence that the putative Father has failed to seek reasonable visitation with the child and failed to manifest an ability and desire to seek legal and physical custody of the child. The Court also finds that placing custody of this child in his legal physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child in addition to failing to file anything to establish himself as the father.

\* \* \*

8. The Court further finds it is in the child's best interest pursuant to Tenn. Code. Ann. §36-1-113(i) for bother [sic] parent's rights to be terminated considering the following factors:

a. The evidence is clear and convincing that neither parent has made an adjustment of circumstance, conduct or conditions since this child has been born that would make it safe and in her best interest to be with them in their home or wherever they reside.

b. The evidence is clear and convincing that neither parent has maintained regular visitation or other contact with the child.

c. The evidence is clear and convincing that neither parent has a meaningful relationship with the child.

d. The evidence is clear and convincing that at this point a change in caretakers would have a negative effect on the child. There is a meaningful relationship between the child and the Petitioners, particularly the grandfather. The child is in a home where she's doing great by all accounts. The child is bonded with her sister and is really bonded with the grandfather.

e. The evidence is clear and convincing that neither parent has paid child support consistent with the child support guidelines.

f. The child is in a loving home with her grandparents who intend to adopt her just as soon as they legally can.

9. The Court finds that best interests are established by clear and convincing evidence.

10. The Court finds based upon the foregoing that the termination of the Mother and putative Father's parental rights is in the best interests of the minor child.

Mother and Father appeal the Juvenile Court's April 5, 2018 order to this Court.

## **Discussion**

Although not stated exactly as such, Mother raises two issues: 1) whether the Juvenile Court erred in finding that grounds to terminate Mother's parental rights for abandonment by willful failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i) had been proven by clear and convincing evidence; and, 2) whether the Juvenile Court erred in finding that it was in the Child's best interest for Mother's parental rights to be terminated. Father raises two issues, which we restate as: 1) whether the Juvenile Court erred in finding that grounds to terminate Father's parental rights for failure to establish paternity pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) were proven by clear and convincing evidence; and, 2) whether the Juvenile Court erred in finding that it was in the Child's best interest for Father's parental rights to be terminated.

With regard to the termination of parental rights, our Supreme Court has instructed:

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected

by the Due Process Clauses of the federal and state constitutions.[3] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 31 L. Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 71 L. Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S. Ct. 1388. ["]Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S. Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S. Ct. 555, 136 L. Ed.2d 473 (1996). The parental rights at stake are ["]far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S. Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759, 102 S. Ct. 1388 (recognizing that a decision terminating parental rights is ["]*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to ["]fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S. Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated ["]fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S. Ct. 1388. This standard

---

[3] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). ["]Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1113[sic](c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[4] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[5] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent

---

[4] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[5] Tenn. Code Ann. § 36-1-113(i).

20

receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1113[sic](k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate

21

parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).

We first consider Mother's issue regarding whether the Juvenile Court erred in finding that grounds to terminate Mother's parental rights for abandonment by willful failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i) had been proven by clear and convincing evidence. In pertinent part, Tenn. Code Ann. § 36-1-113(g)(1) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

Tenn. Code Ann. § 36-1-113(g)(1) (2017). As pertinent, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

22

* * *

    (E) For purposes of this subdivision (1), "willfully failed to visit" means the willful failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation;

Tenn. Code Ann. § 36-1-102(1) (2017).

    With regard to this issue, the Juvenile Court specifically found and held:

    The Court finds by clear and convincing evidence that the Mother willfully failed to visit or just made token visitations. [Grandmother] testified that Mother visited only one (1) time during the four (4) months preceding the filing of the termination petition. Mother testified she visited three (3) times during the four (4) months preceding the filing of the termination petition. Mother knew the location of the placement of the child and did not visit.

    The Juvenile Court found that Mother never voiced any objection or filed anything objecting to the Child's move to Alabama. The Juvenile Court further found that Grandmother and Grandfather attempted to accommodate Mother to allow her to visit with the Child, but despite their attempts, Mother's visitation with the Child was token, at best. The evidence in the record on appeal shows that although Mother does not have a vehicle, she did have the means to visit with the Child in Alabama much more often than she did. Grandmother testified that she offered to take Mother to Alabama and even testified that Mother did not have to pay for food or gas in order to avail herself of these opportunities to visit the Child. Grandmother testified that despite these opportunities, Mother visited the Child only once during the relevant four month statutory period.

    The Juvenile Court clearly believed Grandmother's testimony, and we find nothing in the record sufficient to disturb the Juvenile Court's credibility determination. The evidence in the record on appeal does not preponderate against the Juvenile Court's finding that Mother's visitation during the relevant statutory period was merely token visitation. Given this, we find no error in the Juvenile Court's finding and holding that grounds to terminate Mother's parental rights for abandonment by willful failure to visit pursuant to Tenn. Code Ann. § 36-1-113(g)(1) and Tenn. Code Ann. § 36-1-102(1)(A)(i) had been proven by clear and convincing evidence.

23

Next, we consider whether the Juvenile Court erred in finding that it was in the Child's best interest for Mother's parental rights to be terminated. With regard to making a determination concerning a child's best interest, our Supreme Court has instructed:

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. *In re Carrington H*., 483 S.W.3d at 523 (citing *In re Audrey S*., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S*., 455 S.W.3d at 555 (citing *In re Audrey S*., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id*. When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S*., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id*. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S*., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S*., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H*., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S*., 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the

24

circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

With regard to the Child's best interest, the Juvenile Court specifically found:

a. The evidence is clear and convincing that neither parent has made an adjustment of circumstance, conduct or conditions since this child has been born that would make it safe and in her best interest to be with them in their home or wherever they reside.
b. The evidence is clear and convincing that neither parent has maintained regular visitation or other contact with the child.
c. The evidence is clear and convincing that neither parent has a meaningful relationship with the child.
d. The evidence is clear and convincing that at this point a change in caretakers would have a negative effect on the child. There is a meaningful relationship between the child and the Petitioners, particularly the grandfather. The child is in a home where she's doing great by all accounts. The child is bonded with her sister and is really bonded with the grandfather.
e. The evidence is clear and convincing that neither parent has paid child support consistent with the child support guidelines.
f. The child is in a loving home with her grandparents who intend to adopt her just as soon as they legally can.

The evidence in the record on appeal shows that although Mother does have housing as she is residing with other family members, she does not have a job or a driver's license or state identification. The evidence shows, as discussed above, that Mother has not regularly visited with the Child, has not spoken to the Child regularly on the telephone, and other than on one occasion has not given the Child presents, cards, or letters. The evidence in the record on appeal further shows that Mother never has provided any support for the Child. The evidence supports the finding that Mother has no meaningful relationship with the Child. Furthermore, the evidence in the record on appeal shows that the Child is well-cared for by Grandmother and Grandfather and is thriving in their custody. We find no error in the Juvenile Court's finding by clear and convincing evidence that it was in the Child's best interest for Mother's parental rights to be terminated.

25

Having addressed the issues raised by Mother, we now turn to Father's issue regarding whether the Juvenile Court erred in finding that grounds to terminate Father's parental rights for failure to establish paternity pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) were proven by clear and convincing evidence. As pertinent, Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) provides:

> (9)(A) The parental rights of any person who, at the time of the filing of a petition to terminate the parental rights of such person, or if no such petition is filed, at the time of the filing of a petition to adopt a child, is the putative father of the child may also be terminated based upon any one (1) or more of the following additional grounds:
>
> * * *
>
> (vi) The person has failed to file a petition to establish paternity of the child within thirty (30) days after notice of alleged paternity, or as required in § 36-2-318(j), or after making a claim of paternity pursuant to § 36-1-117(c)(3);

Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) (2017). As pertinent to this case, Tenn. Code Ann. § 36-1-117(c)(3) provides:

> (c) The parental rights of the putative father of a child who has not filed a petition to establish paternity of the child or who has not established paternity of the child who is the subject of an adoption proceeding and who meets any of the following criteria shall be terminated by surrender, parental consent, termination of parental rights pursuant to § 36-1-113, or by waiver of interest, before the court may enter an order of adoption concerning that child:
>
> * * *
>
> (3) The biological father has claimed to the child's biological mother, or to the petitioners or their attorney, or to the department, a licensed child-placing agency, or a licensed clinical social worker who or that is involved in the care, placement, supervision, or study of the child that the biological father believes that the biological father is the father of the child; . . . .

Tenn. Code Ann. § 36-1-117(c)(3) (2017).

With regard to this issue of Father's statutory failure to establish paternity, the Juvenile Court specifically found:

> 23. Putative father never filed anything to say "I'm the biological father."
> 24. The evidence shows that the time the father was in jail and was on work release, he was making $330 a week and could have paid the filing fee if indeed the filing fee was the barrier.
> 25. There is no indication either of these parents have or had any disabilities that would prevent them from working, supporting their child, or doing the other things that parents need to do to regain custody or to establish paternity.
>
> * * *
>
> 6. The Court finds by clear and convincing evidence that the putative father, [Father], failed to file a petition to establish paternity of the child. The Court finds that the putative Father knew he needed to establish paternity. The putative Father, early in the case, even went so far to go [sic] the clerk's office to file a petition but did not have the required money for the filing fee at that particular time. The putative Father never went back to the clerk's office to file the petition. The Court finds by clear and convincing evidence that the putative Father has failed to seek reasonable visitation with the child and failed to manifest an ability and desire to seek legal and physical custody of the child. The Court also finds that placing custody of this child in his legal physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child in addition to failing to file anything to establish himself as the father.

The evidence in the record on appeal shows that Father claimed to Mother and to the petitioners, Grandmother and Grandfather, that he was the Child's biological father, at the latest, at the hearing wherein Grandmother and Grandfather were granted temporary custody of the Child. In fact, there is evidence showing that Father asserted that he was the Child's biological father from the time of the Child's birth. Despite this, Father never filed anything to establish paternity. Father admitted that he knew that he needed to do something to establish paternity of the Child, and also admitted that establishing paternity "should've been my first priority." The evidence in the record on appeal does not preponderate against the Juvenile Court's finding that Father failed to do anything to establish paternity of the Child. As such, we find no error in the Juvenile Court's finding that grounds to terminate Father's parental rights for failure to establish paternity pursuant to Tenn. Code Ann. § 36-1-113(g)(9)(A)(vi) were proven by clear and convincing evidence.

Finally, we consider whether the Juvenile Court erred in finding that it was in the Child's best interest for Father's parental rights to be terminated. We need not reiterate in detail the Juvenile Court's findings with regard to the Child's best interest as these findings are discussed fully above. The evidence in the record on appeal shows that Father never established paternity, never paid any support whatsoever for the Child, never provided the Child with any presents, cards, or letters, never exercised any meaningful visitation with the Child, and has no relationship whatsoever with the Child. As discussed fully above, the Child is thriving in the care of Grandmother and Grandfather.

The evidence in the record on appeal does not preponderate against the Juvenile Court's findings with regard to the Child's best interest. We find no error in the Juvenile Court's finding by clear and convincing evidence that it was in the Child's best interest for Father's parental rights to be terminated.

Having found that grounds for the termination of Mother's and Father's parental rights to the Child and that it was in the Child's best interest for Mother's and Father's parental rights to be terminated were proven by clear and convincing evidence, we affirm the Juvenile Court's April 5, 2018 Order Terminating Parental Rights.

## Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed one-half against the appellant, Tabatha H.; and one-half against the appellant, James M.

_____
D. MICHAEL SWINEY, CHIEF JUDGE